## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ELIZABETH BERG as trustee for the bankruptcy estate of John Wiesner, | ) ) ) | |
| Plaintiff, | ) ) | 15 C 11534 |
| v. | ) ) | Judge Charles P. Kocoras |
| CI INVESTMENTS, INC., | ) ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

**CHARLES P. KOCORAS, District Judge:**

Now before the Court is Defendant CI Investments, Inc.'s ("CI") motion for partial summary judgment on Counts IV-V of Plaintiff Elizabeth Berg's ("Berg") Second Amended Complaint pursuant to Federal Rule of Civil Procedure 56; Berg's motion to strike certain paragraphs of Claudio Bufi's ("Bufi") Declaration pursuant to Federal Rule of Civil Procedure 12(f); CI's motion to strike Berg's Local Rule 56.1 Materials pursuant to Federal Rule of Civil Procedure 12(f); and CI's motion to strike the affidavit of Ian Hamilton ("Hamilton") and additional statements 46-48, which rely on the affidavit pursuant to Federal Rule of Civil Procedure 12(f). For the following reasons, the Court grants in part and denies in part the motions presented.

## BACKGROUND

The following facts taken from the record are undisputed, except where otherwise noted. CI, a Canadian corporation, runs one of the largest investment fund companies in Canada. In 2009, CI began developing a new line of funds called the G5|20 mutual funds which were the first mutual funds of their type in Canada. The G5|20 funds were unique because they guaranteed to pay out for twenty years and that guarantee was backed by the Bank of Montreal ("BMO"). To reduce the cost of obtaining the guarantee from BMO, CI decided to contract with a third party to provide risk management overlay services ("hedging services"). This reduced the risk that the fund's net assets would decline to such an extent due to market volatility so as to trigger a transfer of the fund's assets from CI to a protection portfolio managed by BMO. The head of the G5|20 fund project was Claudio Bufi, Vice President of Product Development and management at CI. Bufi began discussions in 2009 with Charles Gilbert ("Gilbert"), founder and co-owner of Nexus Risk Management, Inc. ("Nexus"), regarding the possibility of engaging Nexus to provide hedging services for the G5|20 fund. In 2011, Nexus made several presentations at CI's offices regarding its ability to provide the hedging services for the G5|20 fund and in late 2011, CI decided to go forward with Nexus. At the time CI decided to go forward with Nexus, Nexus's risk management hedging strategy was not tailored to the G5|20 fund's requirements and required extensive modification. The first G5|20 fund went

live on October 1, 2013. The G5|20 fund that launched October 1, 2013, was the first fund in the G5|20 fund series. A new fund in the series was created each quarter.

## A. Wiesner's Involvement with Nexus

Gilbert met John Wiesner ("Wiesner") in late 2008 or in 2009. At the time, Wiesner was a risk management strategist for the Chicago Board Options Exchange ("CBOE"). On March 17, 2010, Nexus contacted Wiesner for his expertise on an hourly payment basis as an independent contractor. Parties dispute when Wiesner became a Nexus employee. According to CI, Wiesner became a Nexus employee in November 2010. However, Berg contends that Wiesner was an independent contractor for Nexus from March 2010, until August 24, 2012, and did not become an employee until August 24, 2012 – when Wiesner signed an employment contract with Nexus. Berg further claims that Wiesner stopped working for Nexus and focused only on his work as an independent contractor for the CBOE in late October or in early November 2012. According to Berg, Wiesner returned to his employment at Nexus on February 28, 2013. CI disputes Berg's timeline, and maintains that Wiesner was an employee from November 2010 until his termination from Nexus on November 12, 2013.

Wiesner had many different duties at Nexus and he worked on various software programming projects for several Nexus clients, including CI. Some of the duties Wiesner engaged in, aside from programming, included preparing presentations for potential clients, and creating materials for hedging and risk management courses that

3

Nexus taught. Wiesner, as president of Nexus's Chicago office and managing director, negotiated, drafted, and signed several contracts on behalf of Nexus including the lease for Nexus's Chicago office, errors and omissions insurance ("E&O contract"), and contracts with data providers. Parties disagree over Wiesner's involvement in negotiating and drafting contracts between Nexus and CI, such as the January 2013 Loan Agreement and the parties' June 2013 Sub-Advisory Agreement.

## B. Development of the Hedging Strategy and Nexus Software

From 2011 through October 2013, Wiesner worked to develop the hedging strategy and software. Wiesner was joined in his efforts by various Nexus employees including Gilbert, Jonathan Hede, Patrick Dunham, and Gilbert LaCoste. CI employees Bufi, Ryan Son-Kee, and John Murray also worked on the project. The parties dispute the type of software created and when it was created. CI claims Nexus, including Wiesner, created software that consisted of a C++ software program and several Excel spreadsheets known as the "Giant Spreadsheet," the "Realized Historical VIX," the "Weez-a-Tron," the "Validation Tool," and the "Live Trading Sheet" (the C++ program and spreadsheets are referred to collectively as the "Nexus Software"). According to CI, the Giant Spreadsheet was created in March 2011. It contained the hedging strategy for the G5|20 fund and served as the first prototype of the Nexus Software. Beginning sometime between March 2011 and June 2012 and continuing until the launch of the G5|20 fund, CI received a prototype of the Nexus Software. Nexus would make changes to the software based on CI's response and

send it back to CI for further testing and feedback. Nexus and CI employees held telephonic or in-person meetings nearly every week to discuss the software and the changes needed to make the hedging strategy useable. Wiesner worked on the CI project at Nexus's offices at least part of the time and communicated with CI through his Nexus email account.

In June 2013, CI and Nexus executed the Sub-Advisory Agreement which memorialized the terms of CI's engagement of Nexus and set forth each party's obligations and representations. The parties spent more than six months negotiating and drafting the agreement. While the parties dispute Wiesner's involvement in drafting and negotiating the Sub-Advisory Agreement, it is not disputed that Wiesner signed the Sub-Advisory Agreement on Nexus's behalf. The Sub-Advisory Agreement expressly represented that Nexus owned the Nexus Software. CI contends that the agreement also discussed the parties' Software License Agreement, which granted CI a license to use the software. Berg disagrees. In addition to executing these documents, CI received a copy of the Nexus Software source code. Providing CI with the software license was meant to prevent interruption in hedging services and ensure that the G5|20 would continue to receive such services if Nexus was unable to provide them in the future. CI argues that Wiesner raised no objections to these documents or providing the source code to CI.

In August 2013, Wiesner prepared and delivered the final pieces of the Nexus Software to CI in the form of two Excel spreadsheets known as the "Validation Tool"

5

and "Live Trading Sheet."  CI claims the Validation Tool's only use occurred in August 2013 when Wiesner used it to identify differences between the hedging trades called for by the C++ program and those called for by the Giant Spreadsheet.   Nexus used the Live Trading Sheet in conjunction with the C++ program to verify the trades it made each day.  Nexus would send a copy of the Live Trading Sheet to CI each day after the G5|20 fund went live so that CI could verify that Nexus had properly executed the hedging strategy.

## C.    Wiesner Terminated From Nexus

Wiesner and Gilbert's relationship began to deteriorate in the latter part of 2012 and ultimately resulted in Nexus terminating Wiesner in November 2013.  In late 2012, Wiesner sought to renegotiate his terms with Nexus.  The parties disagree as to the terms of any deal they reached during their business relationship.  According to Berg, on July 9, 2013, Wiesner, Gilbert, and Hede executed a "Memorandum of Understanding" under which Wiesner would receive 20% ownership in Nexus in exchange for the use of his intellectual property.  In contrast, CI claims that in early 2012, Gilbert, Hede, and Wiesner had negotiated an agreement to make Wiesner a 20% co-owner of Nexus in exchange for his sweat equity and any intellectual property he owned that Nexus used in its business.  CI further claims that Wiesner opted to receive options for his 20% of Nexus instead of an immediate ownership interest for tax purposes.  By taking options, he could delay paying taxes on the ownership interest until Nexus began earning fees from CI after the launch of the G5|20 fund.

According to CI, by September 2013, Wiesner had unilaterally decided to form his own company and reclaim his intellectual property from Nexus. Wiesner then drafted a purported license agreement licensing his intellectual property to Nexus for a fee. He signed the purported license agreement for both Nexus and himself. However, Gilbert never agreed to the license agreement that Wiesner signed on his behalf. CI maintains they were unaware of Wiesner's claim to own part of the Nexus Software at this time. CI argues that the first time they learned Wiesner claimed to own any part of the Nexus Software was on September 19, 2013, in an email Wiesner sent to Bufi. This email came a year after delivering the first prototype of the software to CI and a month after delivering the final pieces of the software. On November 12, 2013, Gilbert terminated Wiesner.

**D.     CI Terminates Nexus**

CI and Nexus's relationship also began to strain. In January 2013, CI made a $500,000 loan to Nexus so Nexus could pay its employees and overhead costs to finish developing the hedging strategy and software. In January 2014, CI made a $1.75 million purchase of Nexus stock to allow Nexus to remain viable. During this time, the quality of Nexus's services declined and CI became doubtful that Nexus could remain solvent. For that reason, CI decided to replace Nexus. In November 2014, CI terminated Nexus's services for the G5|20 fund.

As part of the termination, and in addition to the monthly risk management fees that CI paid Nexus, CI paid Nexus a $100,000 termination fee. CI also acquired the

Nexus Software as part of the termination, in part, for accounting purposes so that CI could treat its $2.25 million financing of Nexus (the $500,000 loan and $1.75 million stock purchase) as an asset purchase to be amortized over a period of ten years—instead of recognizing the entire $2.25 million as a loss in the fourth quarter of 2014. At the same time, CI licensed the software back to Nexus for $1.

## LEGAL STANDARD

### I.       Motion to Strike

A motion to strike is governed by Federal Rule of Civil Procedure 12(f).  Under Rule 12(f), upon a motion by a party a court may strike from any pleading "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Granting a motion to strike is a drastic measure.  *McDowell v. Morgan Stanley & Co*., 645 F. Supp. 2d 690, 693 (N. D. Ill. 2009).  Furthermore, a motion to strike at the summary judgment stage is disfavored and generally unnecessary, because the Court may only consider admissible evidence when ruling on a motion for summary judgment. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).  For those reasons, Courts generally do not grant motions to strike unless the defect in the pleading causes some prejudice to the party bringing the motion.  *See Affiliated Capital Corp. v. Buck, No*. 1994 WL 691189, at *4 (N. D. Ill. Dec. 2, 1994).

## II.     Summary Judgment

A motion for summary judgment requires the Court to construe all facts and to draw all reasonable inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact arises where a reasonable jury could find, based on the evidence of record, in favor of the non-movant. *Anderson*, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court considers the whole record. *See Id.* at 255–56.

Northern District of Illinois Local Rule 56.1 requires the "party moving for summary judgment to include with that motion 'a statement of material facts as to which the moving party contends there is no genuine issue and that entitles the moving party to a judgement as a matter of law.'" *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (quoting N.D. Ill. R. 56.1(a)(3)).  "The movant bears the initial burden of showing that no genuine issue of material fact exists." *Genova v. Kellogg*, 2015 WL 3930351, at *3 (N.D. Ill. June 25, 2015).  "The burden then shifts to the nonmoving party to show through specific evidence that a triable issue of fact remains on issues on which the movant bears the burden of proof at trial." *Id.*  The non-moving party must respond to the movant's Local Rule 56.1(a)(3) statement and may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits.  N.D. Ill. R. 56.1(b); *see Celotex Corp. v. Catrett*, 477 U.S.

317, 324 (1986).  The non-movant must support her contentions with documentary evidence of specific facts that demonstrate that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

**<u>DISCUSSION</u>**

## I.    Motions to Strike

We first address the various motions to strike, as their resolutions will affect the universe of facts available for our consideration.

## A.    Berg's Motion to Strike Certain Paragraphs of Claudio Bufi's Declaration

Berg moves to strike paragraphs 4, 11, 12, 13, 15, 16, 17, 24, 26, 28, 29, 30, 31, 32, 33, 34, 35, 38, and 44 from Bufi's Declaration.  According to Berg, this Court should strike these paragraphs because they: (i) contradict Bufi's deposition testimony; (ii) state legal conclusions by referring to Wiesner as a Nexus employee; or (iii) constitute conclusory opinions.  As stated at the December 22, 2016 motion hearing, Bufi's two varying statements create a "credibility issue" for the Court. Instead of striking Bufi's statements, the appropriate course of action is for the Court to examine the evidence and make a determination "whether or not one or another is true or whether they are incompatible or compatible."  Additionally, while Berg disagrees with Bufi's categorization of Wiesner's employment status, she has had an opportunity to challenge those assertions in her response brief and Local Rule 56.1 materials.  The Court will examine the facts presented and decide if Bufi's statements regarding Wiesner's employment status are supported or contradicted by the record.

Because these are not circumstances that merit the drastic relief that Berg seeks, the motion to strike is denied.

**B.     CI's Motion to Strike Berg's Local Rule 56.1 Materials**

CI requests this Court to disregard Berg's Local "Rule 56.1 materials entirely and decide the motion on CI's statement alone."  CI contends, "Berg denies facts without properly supporting the denials with evidence and relies on legal conclusions and misstatements of evidence to support her additional 'facts.'"  CI is correct that Local Rule 56.1 is designed to assist the Court in deciding a motion for summary judgment by requiring the parties to identify undisputed facts, organize the evidence, and demonstrate specifically how each side proposes to prove disputed facts using record evidence.  *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F. 3d 524, 527 (7th Cir. 2000).  However, the Seventh Circuit has repeatedly held that courts are allowed "considerable deference" in interpreting local rules.  *See Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011).  While we agree that Berg could have written with more clarity and organization, we do not find that reason enough to impose the extreme sanction CI is requesting.  Therefore, CI's motion to strike Berg's Local Rule 56.1 Materials is denied.

**C.     CI's Motion to Strike the Affidavit of Ian Hamilton and Additional Statements 46-48, which Rely on Affidavit**

CI argues this Court should disregard Hamilton's affidavit because Berg did not previously disclose Hamilton's opinion, in violation of Rule 26.  Under Rule

26(a)(2), a party cannot rely on an undisclosed expert opinion to oppose summary judgment. *Mannoia v. Farrow*, 476 F.3d 453, 456 (7th Cir. 2007). Furthermore, "Rule 37 provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1)."

Berg contends that its disclosure was not untimely because there was no date set to disclose experts due to the parties entering into an abnormal discovery schedule. The Agreed Order signed by Magistrate Judge Cole on January 28, 2016 clearly states that "the parties have opted out of Rule 26 disclosure requirements." For that reason, Berg and CI had no duty to exchange Rule 26(a) disclosures as CI now claims.

CI also argues we should strike Hamilton's affidavit because it fails to meet the requirements of an expert opinion. Specifically, CI maintains that Hamilton's affidavit "offers only vague opinions without explaining the bases or methodology used to arrive at them." We agree. The Seventh Circuit has "said over and over that an expert's ipse dixit is inadmissible." *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008). Rule 56(e) of the Rules of Civil Procedure provides that affidavits supporting and opposing motions for summary judgment must do more than present something that will be admissible into evidence. Expert affidavits must "set forth facts" and a process of reasoning leading to the experts conclusion. *Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*, 877 F.2d 1333,

12

1339 (7th Cir. 1989). "'It will not do to say that it must all be left to the skill of experts. Expertise is a rational process and a rational process implies expressed reasons for judgment.'" *Id.* (quoting *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 627 (1944)). "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Mid–State Fertilizer Co. v. Exch. Natl. Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989); *see Story v. Latto*, 702 F. Supp. 708, 709 (N.D. Ill. 1989) ("[A]n opinion, even if rendered by an expert, does not create a genuine issue of material fact unless the expert sets forth specific facts to support his opinion.").

Here, Hamilton's affidavit simply states that, based on the review of undefined "source material" and "intellectual property created by John Wiesner," he "concluded that the material produced by CI Investments, Inc. contains a Skewed Volatility Formula that is substantially similar to a Skewed Volatility Formula identified by John Wiesner as being created by him in 2001." Hamilton fails to identify any of the specific facts or steps in his reasoning that led him to the conclusion. He does not identify the "source material" he reviewed. He does not articulate how the two formulas were alike or what degree of similarity was necessary to deem them "substantially similar." Berg attempts to preserve Hamilton's affidavit by imploring the Court to consider Hamilton's experience, not his findings. Offering up Hamilton's curriculum vitae rather than specific facts depicting how Hamilton arrived at his conclusions will not suffice. For that reason, the affidavit and related statements 46-48 are stricken.

## II.     Summary Judgment

### A.     Count IV – Copyright Infringement

#### 1.     Work For Hire

CI contends that Berg does not own a copyright in the Giant Spreadsheet under the "work made for hire" theory.  According to CI, since Wiesner was an employee of Nexus when the Giant Spreadsheet was created, he cannot claim ownership of that property.  In contrast, Berg claims that the evidence shows that Wiesner was not a Nexus employee during the entirety of the development of the Giant Spreadsheet.  Thus, Nexus cannot claim ownership under the work made for hire theory.

Generally, copyright ownership initially vests in the author or authors of the work.  17 U.S.C. § 201(a).  "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." *Id.* at § 201(b). The creator of the property is the owner, unless he is an employee creating the property within the scope of his employment. *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992).  To determine whether a work was made within the scope of employment, a court must apply the general law of common agency. *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989).  Under the general common law of agency, the court should consider the hiring party's right to

14

control the manner and means by which the product is accomplished. *Id.* Additional facts relevant to this inquiry include: the skill required to create the work; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and for how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. *Id.* at 751-52. None of these factors alone are determinative. *Id.*

Both parties agree that Wiesner was a Nexus employee from August 24, 2012 to October 2012 and from February 28, 2013 until his termination on November 12, 2013. However, the parties disagree about Wiesner's employment status from November 2010 until August 24, 2012 and October or early November 2012 until February 28, 2013.

CI maintains Wiesner was a Nexus employee beginning in November 2010. In support of its claim, CI directs this Court to an email from November 17, 2010 with the subject line "New Nexus Team Member." In the email, Gilbert, writing to Nexus staff members, states "that John Wiesner ha[d] joined Nexus effective immediately." By the end of November Nexus had provided Wiesner with a computer, a Nexus email account, and access to Nexus' computer network. Wiesner received a Nexus

business card in January 2011. During this period, Wiesner was also provided with software, and subscriptions to Bloomberg Terminal and Active Financial. Nexus listed Wiesner as "President and Managing Director, Nexus Risk Management LLC (Chicago)" in a written presentation and business plan provided to CI in December, 2011. Also, in December 2011Wiesner signed a lease on behalf of Nexus for office space in Chicago.

In contrast, Berg asserts that Wiesner was an independent contractor for Nexus from November 2010 until August 24, 2012. Berg, like CI, directs this Court to emails from November 2010 to explain the parties' business relationship. On November 16, 2010, Gilbert and Wiesner discussed Wiesner's role within Nexus. In the emails, Wiesner states that he "work[s] for Nexus on [c]ontract." The emails further state that Wiesner is a "shared resource by CBOE and Nexus." When discussing Wiesner's pay, Wiesner told Gilbert that "[h]aving some assurity of a minimum of $60k decreases my need to find other outside consulting work." In response, Gilbert writes that Nexus "guarantee[s] a minimum of 12 weeks per year at USD 5,000 per week." Furthermore, the emails show that Wiesner, not CI, had control over when and for how long to work. For example, Gilbert writes to Wiesner asking if Nexus would like more of Wiesner's time:

> [s]ay one month we want more of your time but you can only give us one full dedicated week. Can we pay you 10,000 for that month with the understanding you will be doing a total of 2 weeks work spread out over the month –
> 1 week blocked off and the other week as you are able to find the time?

Additionally, while CI claims that Wiesner being provided with a computer, email address, and business card shows thst Wiesner was an employee, the emails between Gilbert and Wiesner paint a different picture. Gilbert simply asks Wiesner if he wanted a "@nexusrisk.com email account and business cards." Wiesner was not required to use these resources, and was free to turn them down. Further establishing that Wiesner could have been an independent contractor is the fact that during 2010 and 2011 Nexus did not provide Wiesner with health insurance or a W-2 form.

Based on the above facts, there is a genuine issue of material fact that cannot be answered based solely on the evidentiary material set forth by the parties. Therefore, CI's motion for summary judgment on this ground is denied.

2. *Implied License to Use the Copyrighted Materials*

According to CI, Wiesner's actions, and inactions, granted CI an implied license to use Wiesner's intellectual property. Berg argues that an implied license did not exist between Wiesner and CI because CI did not request the creation of Wiesner's intellectual property. Additionally, Berg asserts that even if an implied license existed between Wiesner and CI, there is a genuine factual dispute as to if and when that license was revoked.

A copyright owner may transfer his exclusive rights in a copyright only in writing. 17 U.S.C. § 204(a). Only nonexclusive licenses may be transferred without being reduced to writing. 17 U.S.C. § 101. An exclusive license permits the licensee to use the copyright protected material for a specific use while at the same time

17

promising that permission will not be given to others. *Muhammad Ali v. Final Call*, *Inc*., 832 F. 3d 755, 762 (7th Cir. 2016). An implied nonexclusive license does not transfer ownership of the copyright to the licensee. *Id.* Rather, the copyright owner simply permits the use of a copyrighted work in a specific manner. *Id.*

An implied license is found to be granted when (i) a person (licensee) requests the creation of work; (ii) the creator (licensor) makes that particular work and delivers it to the licensee; and (iii) the licensor intends that the licensee-requestor copy and distribute his work. *Id.* Berg only contests the first element of an implied license.

Berg argues Wiesner did not create the copyrighted works at CI's request because CI never expressly requested creation of the Copyrighted Spreadsheets. We disagree. CI needed a hedging service created for their G5|20 fund. CI specifically contracted with Nexus to provide such a platform. Wiesner either as an employee or an independent contractor was paid to help Nexus create the Nexus Software for CI's requested need. Wiesner testified at his deposition that the Giant Spreadsheet was created "specifically for the Nexus project with CI." In addition, Wiesner helped create the other elements of the software at issue for CI. Wiesner created a Modified Black-Scholes formula similar to the one in the Weeza-tron for the software. Wiesner also created a table of closing prices of the VIX and SPX indices similar to the one found in the Realized Historical VIX spreadsheet. While Wiesner may have borrowed ideas from these Copyrighted Spreadsheets, the evidence suggests that the

actual formula and table of closing prices in the Nexus Software were created specifically for the CI project.

Additionally, the Seventh Circuit has "recognized that a nonexclusive license may be implied from conduct." *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996). Here, Wiesner never objected to CI's use of the software during the two years of its development and even participated in Nexus's licensing the software to CI. *Id.* ("[L]ack of objection is also equivalent to a nonexclusive license."). On June 28, 2013, Nexus, by Wiesner, and CI signed a Sub-Advisory Agreement which licensed the software created by Nexus to CI. The Sub-Advisory Agreement represented that Nexus owned the Nexus Software. Additionally, and contrary to Berg's assertions, the overwhelming evidence shows that Wiesner did not hold out to CI that he owned any part of the software until after its creation and delivery. Wiesner even suggested in an email to Gilbert and Hede that Nexus should charge CI a fee to license the software. The facts demonstrate that, at the time the software was created and delivered, Wiesner did not intend for CI to secure any additional license to use the software. Therefore, CI has an implied license to use the copyrighted materials.

Berg argues that even if CI did have an implied license, it was revoked. According to Berg, the implied license was revoked because: (i) any implied license included a condition precedent that was never satisfied, and (ii) Wiesner's letters to CI after his termination served as revocation of the implied license. We agree with CI that "[n]either argument has any merit."

19

First, use of the copyrighted material was not subject to any condition precedent. Berg's contention that a condition precedent existed finds no support in the record. A condition precedent is something "which must occur or an act which must be performed by one party to an existing contract before the other party is obligated to perform." *Beal Bank Nev. v. Northshore Ctr. THC, LLC*, 64 N.E.3d 201, 207 (Ill. App. 2016) (citation omitted). They "are disfavored and will not be read into a contract unless required by plain, unambiguous language." *I.A.E.*, 74 F.3d at 778 (citation omitted); *See Navarro v. F.D.I.C.*, 371 F.3d 979, 981 (7th Cir. 2004) ("Conditions precedent are generally disfavored" while interpretations that do not include them are favored.). "In Illinois, the courts do not construe a contract to have a condition precedent unless there is language in the instrument that is unambiguous or the intent to create such a condition is apparent from the face of the agreement." *Homeowners Choice, Inc. v. Aon Benfield, Inc*., 938 F. Supp. 2d 749, 758 (N. D. Ill. 2013), aff'd 550 F. App'x 311 (7th Cir. 2013) (citation omitted). The party alleging a condition precedent "bears the burden of establishing that the parties intended to create a condition at the time the contract was made." *Id.* (quoting *MCM Partners, Inc. v. Andrews–Bartlett & Assocs., Inc.,* 161 F.3d 443, 447 (7th Cir. 1998)).

Here, Berg has not shown that a condition precedent existed, or that Nexus unambiguously intended to make it part of their agreement. The emails discussing the agreement do not mention any such condition precedent. Likewise, the July 2013 memorandum of understanding, which modified the original agreement, contains no

such condition precedent. *Homeowners*, 938 F. Supp. 2d at 758 (proponent of condition precedent must establish an unambiguous intent to create the condition precedent at the time of contracting). And despite knowing that CI and Nexus were using the software throughout its development, there is no evidence Wiesner ever told anyone at CI that such use was unauthorized because he had not yet received his 20% interest in Nexus. *See, e.g., I.A.E.*, 74 F.3d at 778 (rejecting condition precedent because "nothing in the contract or in [plaintiff's] later letter indicates that full payment was a condition precedent to the use of his drawings."). The facts, including Wiesner's own words, show Wiesner opted to take options for his 20% stake in Nexus – seemingly for tax purposes. In emails, the E&O application, and in his deposition, Wiesner admits that he had "warrants on 20% of Nexus, Inc." Furthermore, Wiesner's decision to wait until after the G5|20 fund was launched to exercise his option is reflected in emails and the memorandum of understanding. Therefore, Berg's argument is not only unsupported by facts, but it is contradicted by Wiesner's admissions.

Berg's second argument is that Wiesner's letters to CI after his termination served as revocation of the implied license. However, a review of those letters and Wiesner's testimony refute this argument. In his letters, Wiesner threatens to revoke Nexus and CI's ability to use his supposed intellectual property if the parties do not work out a deal to compensate him. While the letters threaten revocation, they did not actually revoke the implied license. Berg offers no evidence that Wiesner ever took

future action after sending the emails. Additionally, Wiesner testified at his deposition that he never attempted to revoke acceptance in writing and could not identify any attempt to do so orally. For example,

> Q: And when did you revoke and take your IP out of the partnership? When did you revoke that and take your IP out?
>
> A: I did not take it out yet.
>
> Q: What?
>
> A: I have not taken it out yet. They still have it.
>
> Q: Did you ever tell [CI] that you had revoked the IP?
>
> A: I don't think so.

Thus, there is no evidence that Wiesner revoked the implied license. For that reason, the motion for summary judgment on Count IV is granted.

**Count V- Unjust enrichment**

CI argues this Court should enter summary judgment in CI's favor on Berg's unjust enrichment claim because it is preempted by the Copyright Act and the Illinois Trade Secrets Act (the "ITSA"). In response, Berg claims that CI has been unjustly enriched by receiving the benefits of Wiesner's intellectual property without proper compensation.

The purpose of the ITSA was to codify the various common law remedies for theft of ideas. *Learning Curve Toys, L.P. v. Playwood Toys, Inc.*, 1999 WL 529572, at *3 (N.D. Ill. July 20, 1999). For that reason, the ITSA '"abolished all common law

theories of misuse of . . . information.'" *Id.* (quoting *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir. 1992)). Thus, the ITSA preempts Berg's unjust enrichment claims. *See Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 733 (7th Cir. 2014).

Similarly, Section 301(a) expressly preempts state common law claims based upon subject matter and rights equivalent to those addressed in the Copyright Act. 17 U.S.C. § 301(a). A state law claim may be equivalent to a copyright claim even if it requires additional elements, if the additional elements do not differ in kind from those necessary for the copyright claim. *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 677–78 (7th Cir. 1986). To avoid preemption, a state law claim must allege conduct that is qualitatively different from that governed by federal copyright law. *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 910 (7th Cir. 2005). Berg has failed to do that. To the contrary, Berg expressly incorporated her copyright infringement claims into her unjust enrichment claim. The only new allegation she brings forth under Count V is that CI was unjustly enriched because it "undervalue[ed] and underpay[ed] for Wiesner's work." However, Berg offers no evidence that CI determined Wiesner's compensation. As CI correctly notes, "Wiesner's belief that he was undercompensated for his work has nothing to do with CI; it is an issue between him and his former employer, Nexus." Therefore, Count V is preempted by the Copyright Act and the ITSA.

**<u>CONCLUSION</u>**

For the aforementioned reasons, CI's motion for partial summary judgment on Counts IV and V of Berg's Second Amended Complaint is granted. CI's motion to strike the affidavit of Hamilton and additional statements 46-48, which rely on the affidavit, is also granted. All other motions are denied. It is so ordered.

Dated: 4/7/2017

_____
Charles P. Kocoras
United States District Judge